# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
Assigned on Briefs October 21, 2014 at Knoxville

## STATE OF TENNESSEE v. DARIUS JONES

**Appeal from the Criminal Court for Shelby County**
**No. 12-01056      Lee V. Coffee, Judge**

**No. W2013-02010-CCA-R3-CD  - Filed January 8, 2015**

The Defendant, Darius Jones, was convicted by a jury of second degree murder, first degree felony murder, especially aggravated kidnapping, reckless endangerment, and two counts of aggravated kidnapping.  The jury sentenced the Defendant to life with the possibility of parole on the first degree felony murder charge.  Following the jury's sentence, the trial court merged the second degree murder conviction into the first degree felony murder conviction.  The trial court then sentenced the Defendant to a total effective sentence of forty-nine years, eleven months, and twenty-nine days on the remaining counts, to run consecutively to the life sentence.  On appeal, the Defendant challenges the sufficiency of the evidence underlying his convictions for second degree murder, first degree felony murder, especially aggravated kidnapping, and both counts of aggravated kidnapping.  Because we hold that the evidence is sufficient to sustain the Defendant's convictions on all counts, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

James E. Thomas, Memphis, Tennessee, for the appellant, Darius Jones.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Senior Counsel; Amy P. Weirich, District Attorney General; and Jeff Jones and Marques Young, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION
### FACTUAL BACKGROUND

The Defendant's convictions arose from the April 11, 2011 murder of the victim,

Cortessa Chambers, at her home in Memphis. The victim died from a single gunshot wound to the head. At trial, the Defendant conceded that he shot the victim but insisted that the killing was accidental and was the result of a struggle between the victim, the Defendant, and the victim's mother, Berthine Chambers.[1]

At trial, Ms. Chambers testified that the victim was the eldest of her four children and that on April 11, 2011, Ms. Chambers was living on Lagena Street with her four children and four grandchildren. Two of the grandchildren living with her were the victim's children, a girl, who was twenty-two months old, and a boy, who was three years old at the time. She additionally testified that the victim was dating the Defendant at the time, that he was not the father of either of the victim's children, and that the Defendant had been staying at the Lagena Street house for the past three or four months. Ms. Chambers stated that the Defendant was also known by the nicknames "Day-Day" and "Bear."

Ms. Chambers testified regarding an incident that occurred sometime before April 11, 2011, although she could not remember the exact date and time. Ms. Chambers was asleep in her bed on a Sunday night when the victim came into her room. Ms. Chambers described the victim's demeanor as "terrified and nervous and shaking." The victim told Ms. Chambers that the Defendant had taken her out to a park, hit her on the head with a gun, and shot at her. Ms. Chambers testified that she got out of bed and searched the house for a gun but did not find anything and subsequently went back to bed. On cross-examination, Ms. Chambers testified that, although she believed the victim's story that the Defendant had assaulted her in the park and threatened her, she did not call the police.

Andrea Nichols testified that she and the victim were childhood friends. She testified that in April 2011, the victim had been dating the Defendant, whom she knew by the nickname "Bear." When asked to describe generally the relationship between the Defendant and the victim, she stated that she could only judge the relationship based on what the victim had told her, which was that "[the Defendant] was going to kill [the victim] and that [they] had been fighting." According to Ms. Nichols, the victim was upset when she related this information to Ms. Nichols, and the victim had been telling her about problems with the Defendant "during the whole month of April."

Ms. Nichols testified that about a week before April 11, the victim told her of an incident that happened at "the Castle," located a couple blocks from the victim's home. According to Ms. Nichols, the victim told her that the Defendant was shooting at her behind the Castle and that "[the Defendant] dropped [the victim] on her head" at a park located across the street from the Castle. Ms. Nichols said that she saw "some scratches and stuff

---

[1]All references to "Ms. Chambers" in this opinion refer to the victim's mother, Berthine Chambers.

on [the victim's] head" after the incident but that she never personally saw the Defendant abuse the victim because she "wasn't around him like that." Ms. Nichols testified that she told the victim, "If you really feel like a person is going to kill you then why stay . . . with him?" Ms. Nichols said the victim responded by saying, "'Cause if I leave him, he going to kill me and get away with it."

Ms. Chambers testified that prior to April 11, 2011, the police had been called to her house after the victim claimed that the Defendant had taken money from her. According to Ms. Chambers, she was outside the house the entire time the police were there, and both the victim and the Defendant were present as well. The police got the money from the Defendant and gave it to the victim, and then the police left. Ms. Chambers went back inside the house, and shortly thereafter the victim and the Defendant also came back in the house. Ms. Chambers testified that the victim was upset and angry when she came back in the house, like something else had happened outside, but Ms. Chambers did not actually witness any physical altercation between the victim and the Defendant. Ms. Chambers admitted that she had never personally witnessed the Defendant harm the victim but said that she had heard the Defendant make verbal threats to the victim.

Felecia Swift testified that she lived on Lagena Street, across from Ms. Chambers's house and that three to four weeks before the shooting, she saw an altercation between "Bear" and the victim. She said that at the time of that incident, she was on the porch of her house and that she saw the police arrive at Ms. Chambers's house. Ms. Swift testified that the Defendant and the victim talked to the police for several minutes, and then the police left the house. After the police left, Ms. Swift watched as the Defendant "slapped the s--t out of her" and called the victim a "[b]---h." Ms. Swift testified that Ms. Chambers was present when the Defendant slapped the victim.

Ms. Chambers testified that on April 11, 2011, the victim had plans to go to the store with Ms. Nichols. Sometime between 11:00 a.m. and noon, the victim entered Ms. Chambers's bedroom and asked to borrow an ink pen. The victim went back into her own bedroom and five to ten minutes later, re-entered Ms. Chambers's bedroom with a note in her hand. According to Ms. Chambers, the victim "was nervous, . . . and shaking and stuff," and the Defendant was standing in the doorway to the bedroom "demanding [the victim] . . . give [Ms. Chambers] the letter" and cussing the victim. Ms. Chambers "snatched the paper out of [the victim's] hand" and set it on the dresser. During trial, the State entered the letter into evidence. The letter read as follows:

To Whom This May Concern:

Everyone know it's nothing like understanding. Me and [the victim] have

argued, fought and everything else since we been together. I have told her everything about me, [a]ll my deepest secret[s] and everything. When she gets high she forget who I am and what I am capable of. I told her several time[s] what this would lead to if she did not honor my wishes. As for her family, they all know her condition. I am very tired of every one calling my bluff. I always say what I mean and mean what I say[.] I have no other choice. She took $100,000 from me and laughed[.]

Next, the victim said that she was going to the store and asked Ms. Chambers whether she needed anything. Ms. Chambers heard Ms. Nichols honk her horn outside the house, and the victim left.

Ms. Nichols testified that on April 11, 2011, she went to Ms. Chambers's house to take the victim and the Defendant to the store and that she drove a white Impala at the time. She testified that her cousin, Justin Montgomery, was in the car with her. When she arrived at the house, she exited her car and knocked on the front door. She testified that the Defendant answered the door and said, "We straight." When Ms. Nichols asked where the victim was, the Defendant answered, "She straight. We good." Ms. Nichols testified that at that point, the victim walked out from the back of the house, and the Defendant stepped outside the house.

Ms. Nichols stated that she and the victim got into the Impala but that the Defendant pulled the victim out of the car. She said that "[w]hen he pulled her out of the car, the victim got away again and [the Defendant] pointed the gun at the victim." Ms. Nichols exited the car and tried to calm the Defendant and the victim down. According to Ms. Nichols, the Defendant "pointed the gun[,] [a]nd when he pointed the gun, [she] got back in the car, and click, click, [the gun] didn't go off." Ms. Nichols returned to her car and watched as the Defendant "dragg[ed] the victim in the house" through the back door.

On cross-examination, Ms. Nichols denied that a second man, Kevin Robinson was in the car when she went to Ms. Chambers's house on April 11. She testified that at one point the Defendant pointed the gun at her and that was when she heard the "click, click." She denied that the Defendant pulled a man with "dreads" out of the Impala. According to Ms. Nichols, after Ms. Chambers came running out of the house, Ms. Nichols backed out of the driveway and parked on the street beside the house. Ms. Nichols admitted that in her statement to police, made on April 11, 2011, she did not report that the Defendant had pointed a gun at her and attempted to shoot her. However, she insisted that it did happen and explained that she left it out of her statement at the time because she was upset that her friend had just been killed. Ms. Nichols also resisted the suggestion that the victim was in possession of a gun when she came out of the house.

Ms. Chambers testified that she heard the victim come back into the house and that she was calling, "Mom, mom." Ms. Chambers went into the victim's bedroom to see what was going on. She saw that the Defendant had the victim in the headlock and was holding a gun down by his leg. The Defendant was cussing the victim, calling her "b---hes" and "motherf--kers."

Ms. Chambers testified that she stepped in between the victim and the Defendant and that the Defendant released the victim from the headlock. The victim got behind Ms. Chambers, and the Defendant said, "B---h you think I won't kill you?" and "B---h give me my damn money." The victim raised her head up from behind Ms. Chambers's back, and the Defendant said, "B---h you think I won't kill you 'bout my motherf--king money?" The victim responded, "Why?," and then the Defendant shot the victim "execution style, in her head."

The Defendant then looked at Ms. Chambers, "recocked" his gun, and pointed it at her. Ms. Chambers shoved the Defendant out of her way and ran out of her house and across the street to a neighbor's house. Ms. Chambers testified that neither she nor the victim ever touched the gun and that her grandchildren were standing in the doorway of the victim's bedroom when she was shot, that they saw what happened, and that they stayed in the house when she ran across the street. Ms. Nichols testified that she saw Ms. Chambers run out of the house saying, "Call the police. He killed my baby. He killed my baby."

On cross-examination, Ms. Chambers testified that she did not push or shove the Defendant before he shot the victim. She stated that she did not touch the Defendant but stood in between the victim and the Defendant, "face-to-face" with him, that she cussed the Defendant, and that she asked him "why he would keep messing with [her] baby." She admitted that there were several details that she left out of her statement to police but explained that any omission could be blamed on the fact that she was very upset at the time she gave her statement.

Latasha Davidson testified that Cynthia Poole is her mother and Felecia Swift is her aunt. She was living with her aunt, her mother, and her grandmother on April 11, 2011. She recounted the following version of events that she witnessed on April 11, 2011:

> We were sitting in my grandmama's room, and where the room is located, it's like a -- like a bathroom. You can see at [sic] the house. And we seen a car pull up, and we seen commotion going on, like -- more like tussling and running and all kinds of stuff. So we're paying attention, and we see a guy with dreads pulling . . . a young lady out of the . . . back seat of the driver's car, and she's getting away, he's chasing her, she gets away again.

. . . .

> They were tussling. It was like he was trying to grab her out of the back seat for some reason. But you could see like she tried to . . . go to the passenger side, . . . but she ended up out of the car some type of way. . . . She gets away and he caught her in a headlock. . . . He had that pistol in his hand, and he had her in a headlock . . . [a]nd the bottom of the gun, he was pounding on top of her head with it.

. . . .

> So he took her back around the house, and some kind of way, she came back again, running, like trying to get back into the car for some reason. . . . [He] [c]aught her again, and two seconds, a lady come running across the street. "He shot my baby in the head."

Later in her testimony, Ms. Davidson clarified that the "guy with dreads" was the Defendant and the "young lady" was the victim. Also, she testified that the vehicle that the Defendant grabbed the victim out of was a white four-door Impala and that the entire episode she had described occurred within about four or five minutes.

Ms. Davidson testified that she made the phone call to 911 and that Ms. Chambers said, "Call – call 911. He shot my baby in the head. He shot my baby in the head." She said that while on the phone, the police asked her what she saw, and she told them she saw "two kids standing in the door. Like just . . . terrified, just standing in the door." While Ms. Davidson was on the phone with police, the Defendant came out of the house and said "I told her, I told her, I told her, I told her. Man, I told her." Then, the Defendant said, "Better not be calling the police 'cause my folks the police." Upon hearing this, Ms. Davidson hung up the phone.

On cross-examination, Ms. Davidson admitted that the first time she spoke with police was June 15, 2011. She denied that the story she told police at that time differed significantly from her trial testimony. Ms. Davidson testified that although she did see the Defendant standing in the doorway of Ms. Chambers's house with two small children, she never saw the Defendant point a gun at either of the children.

Ms. Swift testified that she was at home on April 11, 2011, and that her niece was braiding her hair in Ms. Swift's mother's bedroom, which was located "off the patio of the porch." She saw a white car pull up Ms. Chambers's driveway and saw the Defendant walk up to the car and reach inside. Ms. Swift said that she saw that the Defendant had a gun in

his left hand. The Defendant pulled out a young man and sat him down in the grass. She testified that the Defendant then went back to the car and pulled the victim out, put her in a headlock, and walked her toward the house. Ms. Swift said that she saw his "hand moving" and "[couldn't] just say he was hitting her, but . . . was assuming he hit her."

Shortly thereafter, the victim came running from behind the house, and the Defendant was behind her "pointing a gun, and . . . trying to shoot her, but the gun clicked. It clicked twice." Ms. Swift testified that she ran a daycare at her house and that at this point she became fearful for the children's safety. She left her mother's room and took the children to the back of the house, where she told them to remain. By the time she got back to her mother's bedroom, Ms. Chambers was at the house, and said "He shot my baby. He shot my baby. He shot my baby in the head." She stated that she did not see the victim escape a second time and run back around the house because she was attending to the children at that time. Ms. Swift also testified that although her attention was initially divided between the children and getting her hair done, as soon as she heard the altercation across the street, she focused her attention on that.

On cross-examination, Ms. Swift admitted that she did not talk to police until June 16, 2011. When she did finally talk to police, she did not mention the incident during which she saw the Defendant slap the victim, but she explained that was because she thought the police only wanted information about what she had seen on April 11, 2011. Ms. Swift also testified that she did not call the police after she saw the Defendant pull the victim behind the house in a headlock because domestic disturbances at Ms. Chambers's house were not uncommon, and she had heard talk in the neighborhood about frequent disputes between the victim and the Defendant. She added that she "don't get in that like that."

Cynthia Poole testified that she was at home on the day of the shooting and that she was in her room when her sister, Ms. Swift, "holler[ed]" for her. She immediately went into her mother's room at the front of the house and saw Ms. Chambers run across the street. She testified that Ms. Chambers was "hysterical" and was saying, "He shot her. He shot my daughter. He shot her." At that point, Ms. Poole looked across the street and saw the Defendant, whom she knew by the nickname "Bear," standing in the doorway of the victim's house. She also saw a "little bitty boy" standing in the doorway next to the Defendant and watched as the Defendant put a gun "on top of the little boy's head" while the "little boy was covering his ears, and . . . hollering." Ms. Poole testified that the Defendant then "pushed the little boy back" and shut the front door. Next, Ms. Poole saw the Defendant come outside the house with a gun in his hand. He waved the gun around and said, "I told her, I told her, I told her" before retreating back inside the house. Ms. Poole estimated that at the time these events occurred, she was about one hundred feet from the Defendant and stated that her view was unobstructed.

On cross-examination, Ms. Poole testified that she did not hear anything unusual that day until her sister called for her to come see what was happening across the street. She clarified that at the time she saw what was going on across the street, she was standing in her mother's room, which was located at the front of the house and which she described as the "patio." She testified that the room was enclosed in glass, and thus, she could easily see out and across the street. Ms. Poole admitted that she did not talk to police until June 16, 2011, after an officer from the Memphis Police Department came by her house and asked her whether she saw anything on April 11, 2011. She agreed that providing information to the police "would have been important" but explained that she did not talk to police until June because "didn't nobody ask [her] nothing."

Sergeant Thomas McDaniel testified that he was one of the first responders to the shooting on April 11, 2011. When he arrived at the victim's house, he heard screaming from across the street and went over to investigate. He noticed a woman, later identified as Ms. Chambers, who was very upset and told him that her daughter had been shot by her boyfriend. Sergeant McDaniel then radioed the dispatcher that there was a person in the house with some children and that a woman had been shot. Sergeant McDaniel looked back across the street towards the house and saw a man open the door, look out, and then the man turned back around and closed the door. He testified that the police set up a perimeter around the house to ensure the safety of all involved and also to prevent escape. The Tactical Apprehension Containment Team (TACT) arrived on the scene, and the Defendant was eventually apprehended.

Sergeant McDaniel could not remember exactly how long it took for the Defendant to surrender but stated that it had taken less than one hour. Sergeant McDaniel said that Ms. Chambers told him that the Defendant and the victim had been arguing about money. He also testified that Ms. Chambers did not mention that the Defendant had chased her out of the house but that she was very upset and did not tell him much at the time.

Officer Davin Clemons testified that he was employed by the Memphis Police Department as part of the TACT unit and also that the Defendant was his first cousin. On April 11, 2011, Officer Clemons was at school when he received several phone calls back to back from his grandmother, the Defendant, and his supervisor. He testified that his grandmother was "hysterical" and "nervous" and was "yelling" and "screaming," saying that the Defendant had shot his girlfriend. His grandmother also told Officer Clemons that the Defendant told her "that he blew that b---h [sic] brains out."

The Defendant called Officer Clemons and asked him to "come over [to the house] and get [the Defendant] out of the house," saying that he would not come out unless Officer Clemons was there and that he had "twenty minutes, to get over there . . . or he was going

to hurt himself or . . . those kids." Officer Clemons went straight to the scene, arriving within twenty minutes, and stayed on the phone with the Defendant. He testified that he did not enter the house immediately upon arrival as per his supervisor's instructions. Officer Clemons said that the Defendant was afraid the police were going to shoot him if and when he came out of the house. Officer Clemons testified that the Defendant "didn't sound like [himself] on the phone." Officer Clemons told the other officers at the scene that he had "never known [the Defendant] to act this way."

While on the phone with the Defendant, Officer Clemons told him he was approaching the house. As he walked up to the house, the Defendant came to the door, and Officer Clemons grabbed his arm and pulled him out of the house. Although Officer Clemons heard children inside crying, he never saw them.

On cross-examination, Officer Clemons admitted that the Defendant never told him directly that he had "bl[own] [the victim's] brains out" and that the Defendant never said that he was going to harm the children "right then and there." He confirmed that the Defendant did not sound like himself on the phone and seemed "unstable."

Lieutenant Ernest Greenleaf testified that he was a squad supervisor with the TACT unit on April 11, 2011. Lt. Greenleaf testified that when he arrived at the scene on Lagena Street, he received information that there was a female inside the residence that had been killed and that there were children still inside the house. Based on this information, Lt. Greenleaf decided to take immediate action in order to go in and secure the children, and the officers were able to take the Defendant into custody peacefully and without resistance.

Lt. Greenleaf was qualified as a firearms expert and gave extensive testimony regarding the operation of the .380 Hi-Point used to kill the victim. In particular, Lt. Greenleaf demonstrated the "clicking noise" produced by the gun when there was a magazine present in the gun but no live rounds in the chamber. He explained that the noise was actually the firearm pin dropping, and he moved around the courtroom to demonstrate the sound level produced by the gun at various distances.

On cross-examination, Lt. Greenleaf admitted that he did not personally observe the Defendant threaten any children. He testified that there were around twenty officers already on the scene when he arrived, that all the officers were armed with at least handguns, and that it would not be unusual for some officers to have shotguns or long guns. According to Lt. Greenleaf, only a few minutes passed between his arrival on the scene and the entry into the house to apprehend the Defendant.

Dr. Karen Chancellor, the Chief Medical Examiner for Shelby County, testified that

the victim's cause of death was a single gunshot wound to the head, which would have been rapidly, if not immediately, fatal. In Dr. Chancellor's opinion, the gunshot was a contact wound, meaning that the barrel of the gun was touching the skin when it was fired. She made this determination based on "sooty residues" that were present on the edge of the wound, as well as inside the scalp tissue and on the outside of the skull where the bullet entered the brain. Dr. Chancellor testified that the presence of soot residue in these areas only occurs when there is a contact wound. On cross-examination, Dr. Chancellor agreed that there were no indications that the victim had lacerations on her head and also stated that when a person is struck by a blunt object, like a gun, the skin will break. She testified that the gunshot wound was the only head injury indicated on the autopsy report. On re-direct examination, Dr. Chancellor testified that blunt objects do not always leave lacerations but instead could produce a bruise or abrasion, or, if not much force was used, might not produce an injury at all.

The Defendant testified that he had been dating the victim for about one year before the "accident." When they first began dating, the Defendant was living in a duplex in Memphis, and the victim lived with him there for "a while." About four months before the shooting, the Defendant and the victim moved into the house on Lagena Street. The Defendant owned a gun before he met the victim, and he testified it was the same as that used to kill the victim. He said that he bought the gun for "protection" and "safety."

The Defendant testified that he and the victim had a place in their bedroom where they "stashed" their cash, which he estimated was about $1,000. On Friday, April 8, 2011, the Defendant removed the couple's cash from its usual hiding place because the victim had spent some of the money and he did not want her to take any more. The victim discovered that the money had been moved and called the police. When the police arrived, the victim told them that the Defendant had taken her money. The Defendant denied slapping the victim after the police left and testified that everything returned to normal between him and the victim by the next day.

The Defendant testified that on Sunday, April 10, 2011, he awoke to find that the victim had taken the money from their stash. He called the victim multiple times and also called Ms. Nichols, but neither answered. The Defendant said that he was "upset" that the money was missing. According to the Defendant, the victim returned to the house around 6:00 p.m. that evening. He asked the victim where she had been and where the money was, and she replied that she had been with Ms. Nichols and that she had spent some of the money on a tattoo. The victim also told the Defendant that she had allowed Ms. Nichols to "hold onto" the rest of the money. The Defendant testified that he and the victim went "back and forth" about the money, but the victim told him not to worry about it because she was going to get the rest of the money back. The Defendant again called Ms. Nichols, but she did not

answer.

The Defendant testified that later that night everything had calmed down. He denied taking the victim to any park and also denied choking her "or anything like that." Around 2:00 a.m. on Monday morning, the Defendant was watching TV in the bedroom he shared with the victim. The victim's daughter was crying, and the victim took the child into Ms. Chambers's bedroom. The Defendant testified that he heard the victim tell her mother that he "was messing with her," but he denied that there was any discussion about him keeping a gun in the house. Shortly thereafter, the victim came back into the bedroom with her daughter and fell asleep.

On April 11, 2011, the Defendant and the victim had plans to go buy a new phone, and Ms. Nichols was supposed to take them to the store to get the phone. The Defendant testified that when he got up that morning, he again asked the victim about how much money she had spent and how much was left. The victim told the Defendant not to worry about it and that they would get the money back. The victim then walked toward the back of the house.

The Defendant walked back into their bedroom and heard the victim outside on her phone. He told the victim to tell the person on the phone "that [the Defendant] was tripping on her over the money." When the victim came back inside, she told the Defendant that Ms. Nichols was going to take her somewhere and that Ms. Nichols would take both of them to the store later. At this point, the Defendant testified that he "started getting frustrated" and told the victim "that she was BS'ing" and that "if she'd just give [him] the money, [they could] split it up and he would leave." According to the Defendant, the victim told him that "if he was going to leave, he would be gone already." Frustrated, the Defendant threatened to call the victim's parole officer and report that the victim was using cocaine and pills.

The Defendant testified that he went into the kitchen and got some paper to write a note. According to the Defendant, he "didn't have no certain meaning when [he] wrote it. . . . [He] was just frustrated, and . . . trying to get [the victim] to take [him] serious, and . . . wanted her to think that [he] was going to do something to [himself]" so that "she would stop acting like she was acting." The Defendant testified that the victim walked by and grabbed the note, and the Defendant asked her to give it back. The victim took the note into Ms. Chambers's bedroom, and Ms. Chambers "snatched" it out of the victim's hand. Ms. Chambers read the letter and asked, "What y'all got going on?" The Defendant told Ms. Chambers that the victim had his money, but the victim denied this was true. The Defendant testified that Ms. Nichols then entered the house and walked into the bedroom. Ms. Chambers asked Ms. Nichols whether the victim had given her any money, and Ms. Nichols responded that she had not. The victim then left the room and walked back into her bedroom,

where she exited the house through the patio door.[2]

The Defendant testified that he went into the bedroom after the victim and that he noticed the "comforter on the bed . . . was up . . . where [he] kept his gun." The Defendant exited through the patio door, and when he rounded the corner of the house, he saw the victim with the gun heading towards Ms. Nichols's car, which was parked in the driveway. According to the Defendant, there were two men in Ms. Nichols's car: her boyfriend, Kevin Robinson, and another male, whom he later learned was her cousin, Justin Montgomery. The Defendant walked up to the victim, grabbed her by the arm, and took possession of the gun. Ms. Nichols then exited the house, got into her car, and began reversing out of the driveway. The victim asked Ms. Nichols to wait, but she "sped off out of the driveway in reverse."

The Defendant and the victim then walked back towards the house. The Defendant denied ever putting the victim in a headlock, although he did admit that he "was cussing and stuff like that, but how everything was happening, everything was a big frustration." The Defendant and the victim entered the house through the back patio door that led directly into their bedroom. According to the Defendant, Ms. Chambers came into the room and asked him what he was doing "with that d--n gun" and told him to "[p]ut the d--n gun down."

The Defendant testified that Ms. Chambers walked toward him, "got right up on [him]," and grabbed his arm. Ms. Chambers "was slapping [his] hand, trying to get [him] to put the gun down." The Defendant testified that he did not put the gun down and that he and Ms. Chambers continued to struggle. According to the Defendant, the victim was screaming, telling both Ms. Chambers and the Defendant to stop fighting. The Defendant testified that he was holding the gun in his right hand, Ms. Chambers was holding onto his wrist, and "[t]hen the gun went off." The Defendant "went in a state of shock" because he "knew [the victim] was gone."

The Defendant denied chasing Ms. Chambers out of the house. He testified that after the victim was shot he attempted to "unchamber" the gun and then placed the gun on the dresser. Ms. Chambers "struck out, running out of the patio." The Defendant heard the victim's son calling his name from the hallway. He denied ever pointing the gun towards either of the victim's children and claimed the only time he touched the gun after the shooting was when Officer Clemons asked him where the gun was and told the Defendant to "[m]ake sure the gun [was] in another room." The Defendant then took the gun into Ms. Chambers's room and set it on the dresser. The Defendant claimed that he walked into the living room, with the children tagging along behind him, and looked out the door to see the first police car arriving.

_____

[2]There was a sliding glass patio door in the victim's bedroom that opened out to the back of the house.

According to the Defendant, he was afraid because he saw the police outside with guns and he "didn't know what to do" and "couldn't think straight." He called his grandmother because she "was the first person that came to [his] mind when [he] picked [his] phone up." He told his grandmother that he shot the victim and asked her to call his cousin "to come get [him] before they kill[ed] [him]." He also called his cousin, Officer Clemons. Officer Clemons asked the Defendant whether the victim was dead and where the children were, and he then instructed the Defendant to close the bedroom door so that the children would not see the victim. The Defendant testified that he had no intention of hurting the children and that he did not remember saying he was going to hurt the kids but that he knew he must have said it because Officer Clemons had no reason to lie.

On cross-examination, the Defendant again denied that he had ever slapped the victim. He testified that he was "pretty sure [the victim] didn't tell [Ms. Nichols]" that he had threatened her before. He said that the only time an altercation between him and the victim "got physical" was before he moved into Ms. Chambers's house. He recalled that the victim had come to his house and saw another woman there, that the victim tried to fight him, and that he ended up "pushing her on the ground."

The Defendant testified that only he and the victim knew that the gun was under the top mattress on the bed. He said that the victim was the one who had the gun when she went outside to get in Ms. Nichols's car. He explained that the reason the other witnesses said that he had the gun the whole time was because he was "a guy who was bigger than [his girlfriend], and what happened that day made [him] look like a bully, . . . and . . . they're trying to make it . . . look like [he's] a monster." He went on to say that "they added other stuff that . . . didn't happen." The Defendant claimed that Ms. Chambers had made up parts of her testimony and that some things she said did happen, but "most of it didn't."

The Defendant maintained that the victim was trying to pull Ms. Chambers away from him when the gun went off and that he never aimed the gun at the victim. He further testified that he "didn't have any control over the situation" and wished he would have just left the room instead of struggling over the gun with Ms. Chambers. The Defendant testified that he did not check on the victim or try to help her because "[it] was too late."

## ANALYSIS

The Defendant contends that the evidence is insufficient to support his convictions for second degree murder, first degree felony murder, especially aggravated kidnapping, and two counts of aggravated kidnapping. Essentially, the Defendant argues that because he testified that the shooting was an accident and that he did not kidnap either the victim or her two children, no rational jury could have found him guilty of committing those crimes. The

State responds that there was ample evidence presented from which the jury could determine that the Defendant was guilty of the offenses charged. The State further responds that, although there was conflicting testimony presented at trial, "the jury was entitled to consider all of the proof and give it such weight as they saw fit." We agree with the State.

An appellate court's standard of review when the defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the evidence in favor of the state. See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict. Bland, 958 S.W.2d at 659; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). A guilty verdict "may not be based solely upon conjecture, guess, speculation, or a mere possibility." State v. Cooper, 736 S.W.2d 125, 129 (Tenn. Crim. App. 1987). However, "[t]here is no requirement that the State's proof be uncontroverted or perfect." State v. Williams, 657, S.W.2d 405, 410 (Tenn. 1983). Put another way, the State is not burdened with "an affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt." Jackson, 443 U.S. at 326.

The following standard "applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence." State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). Our supreme court has held that circumstantial evidence is as probative as direct evidence. State v. Dorantes, 331 S.W.3d 370, 379-81 (Tenn. 2011). In doing so, the supreme court rejected the previous standard which "required the State to prove facts and circumstances so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant, and that beyond a reasonable doubt." Id. at 380 (quoting State v. Crawford, 470 S.W.2d 610, 612 (Tenn. 1971) (quotation marks omitted).

Instead, "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Dorantes, 331 S.W.3d at 381. The reason for this is because with both direct and circumstantial evidence, "a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or

ambiguous inference . . . ." Id. at 380 (quoting Holland v. United States, 348 U.S. 121, 140 (1954)). To that end, the duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

## A.  Second Degree Murder

Initially, we note that although the Defendant's second degree murder conviction was merged into the felony murder conviction, he may still challenge the sufficiency of the evidence supporting the merged conviction. See, e.g., State v. Jonathan Freeman, No W2011-02497-CCA-R3-CD, 2012 WL 5928359, at *3-4 (Tenn. Crim. App. Nov. 27, 2012) (conducting sufficiency review of defendant's convictions for possession of more than one-half ounce of marijuana with intent to sell and possession of more than one-half ounce of marijuana with intent to deliver, which were merged into one judgment of conviction); State v. Adam Clyde Braseel, No. M2009-00839-CCA-R3-CD, 2010 WL 3609247, at *8 (Tenn. Crim. App. Sept. 17, 2010) (addressing the sufficiency of the defendant's "merged" conviction for felony murder in the event of further review), perm. app. denied (Tenn. Feb. 17, 2011).

Second degree murder is statutorily defined as the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). Our supreme court has determined that second degree murder is a "result of conduct" offense. See State v. Brown, 311 S.W.3d 422, 431-32 (Tenn. 2010); State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). Accordingly, the appropriate statutory definition of "knowing" in the context of second degree murder is as follows: "A person acts knowingly with respect to the result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b); see Brown, 311 S.W.3d at 431. Whether a defendant acts knowingly in killing another is a question of fact for the jury. State v. Inlow, 52 S.W.3d 101, 104-05 (Tenn. Crim. App. 2000). The jury may infer a defendant's mental state from "the character of the assault, the nature of the act and from all the circumstances of the case in evidence." Id. at 105; see also Brown, 311 S.W.3d at 431.

In the present case, the trial testimony established that the Defendant and the victim were involved in a dispute over money. The Defendant had a history of verbal and physical abuse toward the victim and was swearing and threatening the victim shortly before he shot her. Several witnesses testified that while still outside the house, the Defendant actually pointed the gun at the victim and the gun "clicked." A firearms expert testified that this can happen when the trigger is pulled while the magazine is present but there are no live rounds in the chamber. Ms. Chambers testified that the Defendant said, "B---h, you think I won't kill you?" shortly before he shot the victim "execution style." Dr. Chancellor testified that

the gunshot wound was a contact wound, meaning the barrel of the gun was touching the victim's head when the gun was fired. Although the Defendant presented his own version of what happened that day, the jury was free to reject his contention that the shooting occurred during a struggle and was thus entirely accidental. Accordingly, we conclude that there was ample evidence from which the jury could infer that the Defendant acted knowingly and was therefore guilty of second degree murder.

## B. First Degree Felony Murder

A conviction for first degree murder, as charged in the indictment, requires "[a] killing of another committed in the perpetration of or attempt to perpetrate . . . kidnapping." Tenn. Code Ann. § 39-13-302(a)(2). The only mental state required to commit felony murder is the intent to commit the specific felony. Tenn. Code Ann. § 39-13-202(b). Kidnapping is defined as "knowingly remov[ing] or confin[ing] another unlawfully so as to interfere substantially with the other's liberty," "under circumstances exposing the other person to substantial risk of serious bodily injury." Tenn. Code Ann. §§ 39-13-302(a), -303(a).

The Defendant contends that "there was no evidence other than [that] he and Ms. Chambers were in a struggle to support the [k]idnapping conviction." However, the evidence belies the Defendant's contention. Several witnesses testified that the Defendant pulled the victim out of Ms. Nichols'ss car, placed her in a headlock, and dragged her into the house. The victim escaped once and ran back around the house before being overcome by the Defendant who again took the victim back into the house against her will. Ms. Chambers testified that when she entered the victim's bedroom, she saw the Defendant with the victim in a headlock. Additionally, the Defendant was in possession of a gun, exposing the victim to "substantial risk of serious bodily injury." See Tenn. Code Ann. § 39-13-303(a). After repeatedly threatening the victim, the Defendant shot her in the head. The evidence is therefore sufficient to support the Defendant's first degree felony murder conviction.

## C. Especially Aggravated Kidnapping

A conviction for especially aggravated kidnapping requires proof, in relevant part, that a defendant knowingly and unlawfully removed or confined a victim so as to substantially interfere with a victim's liberty and that the act of confinement or removal is accomplished with a deadly weapon. See Tenn. Code Ann. § 39-13-305(a)(1), -302(a). "[N]othing in the especially aggravated kidnapping statutes requires that the victim be removed for a certain distance or be confined for a certain period of time in order for a defendant's actions to amount to a substantial interference with the victim's liberty." State v. Turner, 41 S.W.3d 663, 670 (Tenn. Crim. App. 2000) (citing State v. Dixon, 957 S.W.2d 532. 535 (Tenn. 1997)), perm. app. denied, (Tenn. 2000).

For the same reasons discussed when affirming the Defendant's first degree murder conviction, we conclude that the evidence was sufficient to sustain his conviction for especially aggravated kidnapping. Again, witnesses testified that the Defendant detained the victim against her will and forced her back into her house while in possession of a deadly weapon, which he eventually used to kill her. The Defendant's bald statement that he "didn't mean for none of this to happen" is not enough to counter the evidence produced at trial and the jury's subsequent finding of guilt. The Defendant's claim is without merit.

## D. Aggravated Kidnapping

Finally, the Defendant challenges his conviction on two counts of aggravated kidnapping of the victim's children. A conviction of aggravated kidnapping, as charged in the indictment, required proof beyond a reasonable doubt that the Defendant "knowingly remove[d] or confine[d] another unlawfully so as to interfere substantially with the other's liberty" and was "in possession of a deadly weapon or threaten[ed] the use of a deadly weapon" while kidnapping the victim. Tenn. Code Ann. §§ 39-13-302(a), -304(a)(5).

The record reflects that after the Defendant shot the victim, he remained inside the house with the victim's two children while in possession of a firearm. He talked to his cousin, Officer Clemons, and threatened to harm the children if Officer Clemons did not arrive at the house within twenty minutes. Although the Defendant did not remember making this threat, he admitted that he must have said it because Officer Clemons had no reason to lie. Ms. Poole testified that she saw the Defendant standing in the doorway of the house, pointing the gun at the boy's head. Officer Clemons testified that he could hear children crying in the house when he took the Defendant into custody. Based on this evidence, we hold that the evidence was sufficient to sustain the Defendant's convictions of aggravated kidnapping of the victim's two children.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

-17-